1  BARRY J. PORTMAN
   Federal Public Defender
2  ELIZABETH M. FALK
   Assistant Federal Public Defender
3  450 Golden Gate Avenue
   San Francisco, CA  94102
4  Telephone:  (415) 436-7700

5  Counsel for Defendant HICKEY

6

7              IN THE UNITED STATES DISTRICT COURT

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10 UNITED STATES OF AMERICA,          )
                                      )   No. CR 07-634 MMC
                Plaintiff,            )
11                                    )   **DEFENDANT'S SENTENCING
   vs.                                )   MEMORANDUM**
12                                    )
   DANIEL M. HICKEY,                  )   Date:        April 23, 2008
13                                    )   Time:        2:30 p.m.
                Defendant.            )   Court:       The Honorable Maxine M.
14                                    )                Chesney
   _____   )
15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT'S SENTENCING MEMORANDUM
*UNITED STATES v. HICKEY,  07-0634 MMC*

1

## TABLE OF CONTENTS

2

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4

    A.    Mr. Hickey's Childhood . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5

    B.    Despite the Setbacks that His Childhood Circumstances Created, Mr. Hickey

6              Succeeded in School and Enrolled in the Marine Corp . . . . . . . . . . . . . . . . . . . . . 3

7

    C.    After Service in the Marine Corps, Mr. Hickey Established a Worthwhile
              Career as a Teacher that Resulted in Forty-Three Years of Service in the Public

8              Schools and Local Colleges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

9

    D.    Despite the Lack of a Father Figure in His Own Life, Mr. Hickey Became a
              Loving Father to Four Children and Never Abdicated His Responsibilities as a

10              Father Financially or Emotionally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

11

    E.    Mr. Hickey Is Now 78 Years Old and Has Serious Medical Problems That
              Require Constant Monitoring By his Doctors at the VA Medical Clinic . . . . . . . 9

12

    F.    Mr. Hickey is Not a Danger to Children . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

13

    G.    Mr. Hickey is Not an Abusive Husband, Father, or Son-in-Law . . . . . . . . . . . 13

14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

15

    I.    The Guideline Range of 78-97 Months is Only the Starting Point for this

16            Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

17

          A.    *Gall* and *Kimbrough* Clarified the Vast Discretion of this Court to
               Impose Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18

          B.    The Ninth Circuit Has Declined to Apply A Presumption of

19               Reasonableness to a Guideline Sentence . . . . . . . . . . . . . . . . . . . . . . . . . 16

20

    II.    As the Child Pornography Guidelines under U.S.S.G. § 2G2.2 Were Not
            Formulated Through Empirical Data and National Experience, this Court

21            Should Afford the Guideline Range in This Particular Case Less Weight

22            than Empirically Formulated Guidelines. . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

23

          A.    In *United States v. Baird*, a Federal District Court Aptly Applied
               Kimbrough to the Child Pornography Guidelines. . . . . . . . . . . . . . . . . 17

24

          B.    Because the 2003 Guideline Enhancements to Possession of Child
               Pornography Guidelines Drastically Increased Sentences Without

25               Corresponding Empirical Data and National Experience, this Court
               Should Follow *Baird*'s Lead . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

26

III.   The Factors Listed in 18 U.S.C. § 3553(a) Support the Imposition of a Home
       Detention Sentence In this Matter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

       A.    The First Factor: The Nature and Circumstances of the Offense and the
             History and Characteristics of Mr. Hickey . . . . . . . . . . . . . . . . . . . . . . . 20

       B.    The Second and Third Factor: The Need for the Sentence Imposed and
             the Types of Sentences Available. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV.    If a Sentence of Incarceration is Imposed, this Court Should Allow Mr. Hickey
       to Self-Surrender Directly to a Bureau of Prisons Facility that is Prepared to
       Handle His Many Medical Conditions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*United States v. Baird,*
    2008 U.S. Dist. LEXIS 2338 (D. Neb. Jan. 11, 2008) . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Booker,*
    543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Carey,*
    895 F.32d 318, 324 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Carty, ___F.3d___,*
    2008 U.S. App. LEXIS 6084 (9th Cir. 2008)(en banc) . . . . . . . . . . . . . . . . . . . . . . . 16

*United States  v. Claiborne,*
    439 F.3d 479 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Coughlin,*
    500 F.3d 813 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Coughlin,*
    2008 U.S. Dist. LEXIS 11263 (W. D. Ark)(February 1, 2008) . . . . . . . . . . . . . . . 22, 23

*United States v. Detwiler,*
    338 F. Supp. 2d 1166 (D. Or. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Gall,*
    128 S. Ct. 586 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17, 25

*United States v. Kimbrough,*
    128 S. Ct. 528 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17, 23, 24

*United States v. Long,*
    977 F.2d 1264 (8th Cir 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Martinez-Guerrero,*
    987 F.2d 618 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Pauley,*
    511 F.3d 468 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Pruitt,*
    502 F.3d 1154 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Wadena,*
    470 F.3d 735 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

FEDERAL STATUTES

18 U.S.C. § 2252(a)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3143(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

18 U.S.C. § 3145(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S.S.G. § 2G2.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

U.S.S.G. § 5H1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

U.S.S.G. § 5H1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

MISCELLANEOUS

*The Protect Act*, Pub. L. No. 108-21 (2003) § 401(i)(1)(B),(C) . . . . . . . . . . . . . . . . . . . . . . . . 19

Skye Phillips, *Protect Downward Departures: Congress and the Executive's Intrusion
      Into Judicial Independence*, 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

iv

1  BARRY J. PORTMAN
   Federal Public Defender
2  ELIZABETH M. FALK
   Assistant Federal Public Defender
3  450 Golden Gate Avenue
   San Francisco, CA  94102
4  Telephone:  (415) 436-7700

5  Counsel for Defendant HICKEY

6

7              IN THE UNITED STATES DISTRICT COURT

8            FOR THE NORTHERN DISTRICT OF CALIFORNIA

9
   UNITED STATES OF AMERICA,        )
10                                   )  No. CR 07-634 MMC
             Plaintiff,             )
11                                   )  **DEFENDANT'S SENTENCING**
   vs.                              )  **MEMORANDUM**
12                                   )
   DANIEL M. HICKEY,                )  Date:      April 23, 2008
13                                   )  Time:      2:30 p.m.
             Defendant.            )  Court:     The Honorable Maxine M.
14                                   )             Chesney
   _____ )
15

16

17                        **INTRODUCTION**

18       Now appearing before the Court for sentencing is Daniel Marshall Hickey, a 78 year old man

19  who has been convicted of one count of possessing child pornography, in violation of 18 U.S.C. §

20  2252(a)(4)(B).  As calculated by the Probation Officer, the Guideline range faced by Mr. Hickey is

21  extremely high for a straight possession case – 78 to 97 months for a first-time offender.  She has

22  instead recommended a 54 months sentence in recognition of many mitigating factors now before the

23  Court - not the least of which is Mr. Hickey's age and precipitous medical condition.

24       Mr. Hickey stands before this Court filled with shame and remorse.  As far as the seriousness

25  of this offense, Mr. Hickey concurs with many of the arguments made by the government, and is

26  disgusted with himself for playing any role in the chain of demand that fuels the production of child

pornography.  He offers no excuse for his offense conduct, and is fully prepared to accept the judgment of this Court in punishment.  At sentencing, he will only ask the Court to look fully at his life as a whole – a life that has included forty three years of community service as a public school teacher, armed services veteran, and a loving, responsible father.  Part of this request is also a humble plea for this Court to also consider his current circumstances and the opinion of his doctors regarding his longevity.  Almost everyone who faces prison time is afraid of walking into unknown conditions of confinement, including Mr. Hickey.  However, the driving concern of this case, as identified by the Probation Officer, is ensuring that the sentence imposed gives Mr. Hickey a fighting chance to survive.  The primary doctor who has treated Mr. Hickey for years is concerned that, at 78 years old, Mr. Hickey may well not survive any prison sentence, which will take him away from the knowing care of the VA Medical Center.  As eloquently written by the Probation Officer in her Sentencing Recommendation, "a prison sentence of any length will most likely have a far greater impact on this defendant compared with other similarly charged defendants."  Mr. Hickey's age and health considerations are an overarching factor that take this case out of the heartland of a stringent Guideline range - and are the kinds of factors that this Court should strongly consider when arriving at a fair and just sentence, "no greater than necessary" to fulfill the goals of sentencing.  See 18 U.S.C. § 3553(a).

    For the foregoing reasons, in full apology for the horrible images found on his computer – and with a vow to attend any treatment imposed by the Court with earnestness – Mr. Hickey respectfully requests this Court to sentence him to 12 months of home confinement as a condition of five years of probation.

## STATEMENT OF FACTS

### A.    Mr. Hickey's Childhood

    Mr. Hickey had led a life marked with much joy, but also significant trauma.  In 1933, when Mr. Hickey was three years old, his physically abusive father abandoned the small family unit that had been comprised of Mr. Hickey, his mother, his father, and his sister Sharon.  Mr. Hickey's

mother, Marie, who suffered from mental health problems, found herself unable to cope with two small children alone during the Great Depression.  Accordingly, Marie ended up leaving Mr. Hickey and his sister at the German Protestant Orphanage in St. Louis, Missouri.   The orphanage itself was another source of trauma for Mr. Hickey, as the children there were required to work with their food and lived under harsh punitive conditions if they stepped out of line.  He was not often permitted to see his sister Sharon, as the male and female residents of the orphanage were separated by a fence.

Mr. Hickey's parents attempted to reunite when Mr. Hickey was approximately 13 years old, in 1942 or 1943.  The family moved to Reno, Nevada, where it did not take long for Mr. Hickey's father to rekindle his abusive mannerisms.  *See* PSR at ¶ 43.   At fourteen, Mr. Hickey was sent to foster care in Reno and Carson City, Nevada, which was a largely unregulated entity in the 1940s.  Nearly two years of abuse and neglect followed for Mr. Hickey.  *See* PSR at ¶ 43.

**B.    Despite the Setbacks that His Childhood Circumstances Created, Mr. Hickey Succeeded in School and Enrolled in the Marine Corp**

All in all, Mr. Hickey's formative years were not spent in the coddled sanctity of a loving home, with loving parents.  He had no father figure or male role model whatsoever, and between ages five and sixteen, he did not enjoy any feelings of security or comfort in his living situation.  Despite his father's poor treatment of both children and sporadic interest in their lives, Mr. Hickey never stopped attempting to build some kind of relationship with him, most likely due to the fact that he remained desperate for some kind of father figure throughout early adulthood.

Unsettled living situations such as those experienced by Mr. Hickey often lead an individual to make poor choices in life early.  Yet Mr. Hickey stayed on the correct path, earned a B average in school, and ultimately rose to become student body president of Carson City High School.  *See* Declaration of Elizabeth M. Falk ("Falk Declaration") at Exhibit G (newspaper clipping reporting Mr. Hickey's election).  During his summers, Mr. Hickey worked at odd jobs in Reno and Lake Tahoe, such as dishwashing and running luggage at area hotels.  Through these jobs, Mr. Hickey's learned a strict work ethic and the importance of being able to support oneself.

At age 19, Mr. Hickey continued along that favorable path by honorably electing to serve his country as an enrollee in the United States Marine Corp. *See* PSR at ¶62; *see also* Falk Declaration, Exhibit E (documentary proof provided to the Court of Mr. Hickey's enrollment in the United States Marine Corp, his record of service and deployment, and letters of commendation regarding his service.) Service as a United States Marine was a source of pride and esteem-building for Mr. Hickey. It was also, however, a further source of trauma in his life, as he was deployed to defend our nation on the shores of Korea during the Korean War.

Mr. Hickey's rite of passage to combat service was a twelve week boot camp in San Diego, filled with strenuous combat training, strict discipline, and physical punishment for minor infractions. A four month tour at Camp Lejuene followed in 1949-1950, where Mr. Hickey learned military tactics and completed classroom instruction. He then completed another physically demanding infantry training at the beaches and forests surrounding Camp Pendleton. Training came to an end when the Korean War broke out in August of 1950. Mr. Hickey was immediately assigned to the 1st Combat Service Group, and ultimately served in the 1st Tank Battalion of the 1st Marine Division. His battalion was assigned to enter Korea at Incheon Landing, where he engaged in real time, ugly hand-to-hand combat with North Korean and Chinese soldiers. *See* Falk Declaration, Exhibit E, Discharge Records (indicating that Mr. Hickey discharged at the rank of Staff Sergeant and engaged in military combat missions in Korean between August and December of 1950). He earned numerous awards, medals and commendations during this intense period of combat service. *See id.*, Letter from the Department of the U.S. Navy indicating that Mr. Hickey earned over ten badges, medals and award for his military service; *see also id.*, Presidential Unit Citation Descriptions of Awards, indicating the nature of the combat in Korea that entitled Mr. Hickey to the citations).

After suffering a serious injury, Mr. Hickey left Korea for surgery at Oak Knoll Naval Hospital in Oakland. Following surgery, he continued served back in the United States on Marine Corps burial detail. In that position, Mr. Hickey made arrangements for burial of fallen comrades

1  and participated in these burials across the country (including traditional military burials with

2  presentation of the U.S. flag and gun salutes), contacted next-of-kin regarding deaths of Marine

3  soldiers, and arranged for the transportation of their corpses to the proper hometowns.  This detail

4  was difficult emotionally, but was an area of service in which Mr. Hickey thrived.  *See* Falk

5  Declaration, Exhibit E, Letter from Dutcher family (regarding Mr. Hickey's conduct and attitude in

6  arranging the funeral of their son while on burial detail.)  This letter details Mr. Hickey's

7  responsibilities on burial detail; namely, accompanying caskets of fallen soldiers to their hometowns,

8  meeting with the family of the fallen soldier, and arranging a military funeral to honor their service.

9  According to the Dutchers, Mr. Hickey "performed his duties as if they were of very personal

10  concern" to him, and "seem[ed] to be well informed, trained, and gifted in everything that was

11  necessary to do."  *Id.*

12       **C.    After Service in the Marine Corps, Mr. Hickey Established a Worthwhile Career**
            **as a Teacher that Resulted in Forty-Three Years of Service in the Public Schools**
13          **and Local Colleges.**

14       Upon discharge from the Marine Corps, Mr. Hickey attended college at San Francisco State on

15  the GI Bill, as well as various scholarships.  He earned his bachelor's degree in 1957 and began work

16  as a high school teacher in Oakland, California in 1960 after earning his secondary education

17  teaching credential.  *See* PSR at ¶¶ 61, 65; *see also* Falk Declaration, Exhibit F (copies of diplomas

18  and teaching credentials).  As the Probation Officer's Sentencing Recommendation notes, prior to his

19  arrest, Mr. Hickey had a distinguished forty-three year career as a teacher in public schools and San

20  Francisco City College.  He taught full time at the Oakland Unified School district for thirty-four of

21  those years, largely working at Skyline High School, as well as Castlemont Hugh.  *See id.*, Letters of

22  Recommendation from Skyline High School (describing Mr. Hickey as "a person who makes

23  Skyline High School work" and as an individual whom "teachers always sought his advice and

24  direction and he represented them professionally and intelligently.")  The letters of recommendation

25  further describe Mr. Hickey as a "man of character, honesty and integrity" with "a willingness . . . to

26  help anyone who asked for aid."  While so employed, Mr. Hickey was a part of numerous

1   committees, including serving as president of the Oakland Federation of Teachers, as Chairman of

2   the teacher's bargaining team, and as an officer in the teacher's union for many years.  *See* Falk

3   Declaration, Exhibit F (letters of thanks for service on Bargaining team).  He also participated in

4   community service projects with the Vietnamese community, and is known to be "committed to civi,

5   community, and church causes and projects."  *See* Falk Declaration, Exhibit F (letter from Nguyen

6   Phuong); *see also* Letter of Larry Gelwix, Falk Declaration, Exhibit D.

7        This extensive career came to an unfortunate end with Mr. Hickey's arrest on the instant

8   charges.  After the San Francisco Police Department searched Mr. Hickey's home and computer, Mr.

9   Hickey was fully cooperative in the officers' investigation pre-indictment.  He hired private counsel,

10  who believed he had successfully negotiated a voluntary self-surrender for Mr. Hickey to the

11  authorities if the investigation so necessitated.  Unfortunately, this never occurred, as Mr. Hickey

12  was ultimately arrested and handcuffed by the FBI at City College during the workday in front of

13  several fellow teachers and administrators he had known for many years.  The arrest also occurred in

14  front of numerous students.  Although he has been placed on "administrative leave" pending the

15  outcome of this case, Mr. Hickey's guilty plea ultimately means his certain termination from City

16  College, loss of income, and potential payback of all administrative leave collected since his arrest.

17       **D.   Despite the Lack of a Father Figure in His Own Life, Mr. Hickey Became a
             Loving Father to Four Children and Never Abdicated His Responsibilities as a
18           Father Financially or Emotionally**

19       Mr. Hickey has also worked hard to be a loving and present parent to each and every one of his

20  children.  His first wife, Kathleen Ireland, abandoned Mr. Hickey and his first daughter Holly when

21  she was only three months old, in 1961.  At that time, Mr. Hickey was just starting his teaching

22  career, and had no idea how to raise an infant daughter.  However, his own painful experiences in

23  orphanages and foster care precluded him from even considering placing the child up for adoption.

24  By working as a part-time teacher during the day and a taxi driver at night, Mr. Hickey was able to

25  both support and raise Holly as a single father for her entire childhood.  As he had no relatives living

26  at the Bay Area at that time, Mr. Hickey raised Holly without any familial help.

1       Holly is now 48 years old, happily married and works as a flight attendant for United Airlines.

2   Throughout Mr. Hickey's arrest period, his daughter Holly has supported and stood by him. *See* Falk

3   Declaration, Exhibit D, Letter of Support from Holly Sadoff. She refers to him as an individual who

4   "took great care of me." Ms. Sadoff will be present at sentencing to address any inquiry the Court

5   has of Mr. Hickey's background as a father and provider.

6       Mr. Hickey has at least one other daughter, Veronica Breen, and possibly a son named Stephen

7   Sommers with ex-wife Mary Varela.[1] Although he is not certain that Stephen Sommers is in fact his

8   biological son, Mr. Hickey made certain that he paid each and every child support obligation

9   required for their care since the time they were born, despite his ongoing difficulties with their

10  mother. He has tried to maintain a good relationship with his daughter Veronica in particular, but

11  has faced the obstacle of Mrs. Varela time and time again. Their relationship over the years is

12  accordingly been on again, off again, but Mr. Hickey ensured that the financial component of his

13  support was always present, even if Mrs. Varela stood in his way of being physically present for Ms.

14  Breen. Mr. Hickey's relationship with Ms. Breen has essentially disintegrated since the filing of this

15  case, which is unsurprising given the way these charges arose. To date, Ms. Breen has not been

16  responsive to any of the parties inquiries, including U.S. Probation.

---

[1] One of Mr. Hickey's two factual objections to the Presentence Report is the inclusion of Paragraph 10, the comments made about Mr. Hickey by ex-wife Mary Varela, aka Moriah Stafford. As a starting place, these "comments" are listed in "Offense Conduct," which Mrs. Stafford's alleged personal views about Mr. Hickey have no part in. Mrs. Stafford has no connection to the instant offense, and the mere fact that the FBI interviewed her during their investigation does not render her commentary about her past with Mr. Hickey relevant to the facts of this offense. Second, Mrs. Varela's comments in the PSR and all hearsay, and they have not been verified or confirmed by the Probation Officer. Third, Mr. Hickey's daughter, Holly Sadoff, has explained on numerous occasions that Mrs. Stafford's allegations are flatly untrue. *See* Sadoff Letter, Falk Declaration Exhibit D; *see also* Declaration of Holly Sadoff, Falk Declaration Exhibit D, at ¶ 2-3. She refers to her motion in law as abusive, as telling "outrageous lies" and "a little disturbed." *Id*. Fourth, Mr. Hickey himself vigorously denies and objects to Ms. Stafford's accusations. He has provided both the government and the Probation Officer with documentation indicating that Mrs. Stafford has been physically intrusive and abusive over the years toward him, which Mr. Hickey will provide the Court at sentencing if necessary. In sum, the allegations made by Mrs. Stafford listed in Paragraph 10 are not reliable enough to be contained in a document as important as a Presentence Report, which should only contain information that bears some indicia of credibility and reliability. The Stafford comments do not. Accordingly, Mr. Hickey respectfully requests that they be removed.

1    Finally, Mr. Hickey is the current parent and caretaker of 14 year old son Harlan, who has

2    written his own letter to the Court in support of his father's sentencing. *See* Falk Declaration,

3    Exhibit D, Letter of Harlan Hickey. In this letter, Harlan explains that his father "takes me to school

4    in the morning and picks me up from school and helps me with my homework. He has been doing

5    this for me since kindergarten." *Id.* He further explains that he has been diagnosed with ADD, and

6    that he attends a special class with a special teacher to "help him stay focused" on his schoolwork.

7    *See id.* Harlan also verifies that Mr. Hickey "has meetings" with his teachers to make sure he stays

8    on track with school assignments. *Id.* He also describes that his father is his primary caretaker who

9    supervises his activities after school until approximately 9:30 p.m. at night, when Mrs. Hickey

10   returns home from her job at PriceWaterhouse Coopers. *Id.* He calls Mr. Hickey a "great father"

11   and "a good, good man" who has physically cared for his in-laws when they are sick. *Id.* These

12   thoughts are mirrored by Mr. Hickey's mother-in-law, Calixta Ho, who has also written a letter of

13   support to the Court on Mr. Hickey's behalf. *See* Falk Declaration, Exhibit D, Calixta Ho letter

14   (detailing the assistance and aid that Mr. Hickey provided to herself and her husband, particularly

15   when Mr. Ho was in the hospital for six months recovering from a heart attack). He further indicates

16   that he has never witnessed his father doing "anything wrong" in Harlan's presence, and asks the

17   Court to show leniency to his dad. *Id.*

18   The reality of the Hickey family is that Mr. Hickey is Harlan's primary caretaker who is

19   responsible for the feeding, care, and oversight of Harlan on a daily basis. Mr. Hickey has spent

20   countless hours with Claire Lillenthal Elementary School staff working to understand and support

21   treatment of Harlan's ADD learning disability. While most 14 year old boys have achieved

22   scholastic independence, the entire Hickey family agrees that Harlan's disability requires more

23   careful monitoring of his academic progress and homework than do other children who are not in

24   special education classes. *See* Letter of Estella Hickey, attached hereto as Exhibit 1, at 3. Mr.

25   Hickey has done everything he can to be a protective and loving father to his son Harlan.

26   Incarceration of Mr. Hickey will undoubtedly affect Harlan significantly, as there will not be an

individual available in the family with the time and ability to attend to his special education needs.

**E.    Mr. Hickey Is Now 78 Years Old and Has Serious Medical Problems That Require Constant Monitoring By his Doctors at the VA Medical Clinic**

The most significant factor driving Mr. Hickey's life at the current time is the state of his physical and mental health. This factor was a strong consideration in the Probation Officer's recommendation of a departure for Mr. Hickey. As indicated by his treating physician at the VA Medical Clinic, Mr. Hickey suffers from numerous ailments, the medication for which interact in potentially harmful ways. *See* Falk Declaration, Exhibit A, Letter of Dr. Michael Shlipak. If these different conditions are not managed simultaneously, medication used to treat one disease can exacerbate or cause a reaction in Mr. Hickey related to another disease that he has. According to Dr. Shlipak, Mr. Hickey takes eleven different medications at the current time that are constantly being adjusted by VA Medical staff. He visits the VA Medical clinic an average of twice a week to effectively manage all the diseases, including Stage 3/4 kidney disease (which is likely to require dialysis in the near future), heart failure, sleep apnea, atrial fibrillation, thyroid disfunction, osteoarthritis, and hypertension. *Id.* His sleep apnea is so severe that he is required to sleep with a C-PAP ("continuous positive airway pressure") machine to keep him breathing normally. In addition, Mr. Hickey is a prostate cancer survivor who is currently in remission.

Any of these conditions, standing alone, could most likely be managed decently by medical staff at an appropriate Bureau of Prisons facility. For example, it is more than likely that the Bureau of Prisons can make arrangements for an inmate to receive dialysis; it is far less likely that a standard doctor at the Bureau of Prisons charged with caring for hundreds of inmates is going to be able to understand Mr. Hickey's history and combination of ailments in a meaningful enough way to manage his medications in the manner that Dr. Shlipak currently does. It is the combination of illnesses, as well as the complicated nature of the treatment of those illnesses as they intersect with each other, that sets this case apart from the standard case in which an individual facing prison time has a serious medical condition. The fact that the various medical conditions are currently stabilized under the care of a doctor who has treated Mr. Hickey for years is not a balance that this Court

DEFENDANT'S SENTENCING MEMORANDUM
*UNITED STATES v. HICKEY,* 07-0634 MMC          **- 9 -**

1 | should take lightly.  The fact that Mr. Hickey is also prescribed powerful psychiatric medications to

2 | control clinical depression only adds to the delicate formulation of medication.

3 | It is fair to assume that none of the parties, including the government, would want to impose a

4 | sentence that would lead to Mr. Hickey's early or hastened demise in prison.  The opinion of a doctor

5 | who has treated Mr. Hickey for years believes that a prison setting that removes him from his regular

6 | doctor's care will result in that early demise.  It is unclear what the government's response is to this

7 | argument.  At first, it appears that the government is saying that the doctor letters are fabricated

8 | because the doctor's assessment of Mr. Hickey's medical condition is contradicted by the fact that

9 | his landlord stated that he takes in large boxes and mail (and empties trash bins) as a part of his

10 | apartment management responsibilities.  *See* Gov. Mem. at 7: 24-26; see id. at 8:1-2 ("In contrast to

11 | this active and vigorous life, defendant[2] now seeks to paint a picture of a man on the verge of acute

12 | kidney failure.")  This argument takes William Joe's letter completely out of context.  In reality, Mr.

13 | Hickey's job to "take in large boxes and mail" means that he buzzes in the Federal Express delivery

14 | person so he or she can deliver packages in the apartment.  Similarly, Mr. Hickey manages the

15 | emptying of trash bins - he does not empty any trash bins himself.  *See* Second Letter of William Joe,

16 | attached hereto as Exhibit 2.  As apartment manager, Mr. Hickey essentially has a desk job, other

17 | than hosing off a sidewalk or two every other week.  *Id.*  He is in charge of rentals, calling for

18 | repairs, and acting as a middleman between the owner, William Joe, and the tenants.  *Id.*  All

19 | sweeping of common area stairs is done by Mrs. Hickey.  In sum, Mr. Hickey's position as the

20 | apartment manager does not at all detract from his doctor's diagnosis of his acute medical problems.

21 | Assuming that the government does not plan to argue that Mr. Hickey's doctors have

22 | fabricated the listed medical conditions, the government other two responses miss the point entirely.

23 | Its first argument is the fact that the doctors' letters "do not reflect an accurate understanding of the

24 | defendant's crime."  Gov. Mem. at 8:5-6.  Yet it is not the doctor's job to hypothesize about the

25 |

26 |

[2] In fact, it is Mr. Hickey's doctors, not Mr. Hickey, who have professed an opinion about his current medical condition.  It is inappropriate to attack Mr. Hickey himself for his doctor's straightforward medical opinion of Mr. Hickey's condition.

1  instant case, or weigh the import of the criminal conduct against the severity of Mr. Hickey's

2  medical conditions or his compromised mental condition.  The doctors are no more than messengers

3  of information about facts and medical opinions; any opinion on their part about the need to put Mr.

4  Hickey in prison due to the offense conduct would be quite improper.  It is the Court that is in the

5  best position to weigh the relevant information that the doctors provide against the seriousness of the

6  defendant's conduct and all other relevant 3553(a) factors, including the need for incarceration as a

7  punishment.

8        Second, the government argues that Mr. Hickey's doctor has no understanding about the

9  medical facilities available at the Bureau of Prisons.  This argument also misunderstands the import

10  of Dr. Shlipak's message.  Dr. Shlipak is not simply stating that Mr. Hickey could not receive the

11  medications he now receives while in federal prison (although it is doubtful that several of the more

12  expensive brand name medications are not on the National Formulary and would be made available.)

13  Instead, Dr. Shlipak explains that Mr. Hickey's combination of conditions requires a delicate balance

14  of medication that is closely monitored by himself and a team of professionals who have been

15  treating Mr. Hickey for several years.  It is far less likely that Bureau of Prison doctors will be able to

16  monitor Mr. Hickey as Dr. Shlipak is doing on the simple basis of lack of historical knowledge and

17  understanding – once conditions intersect and begin to affect each other, diagnosis and treatment

18  become significantly more complicated.  Knowledge of Mr. Hickey's past medical history and

19  current ailments on a global scale becomes critical.  In Dr. Shlipak's professional opinion, removing

20  Mr. Hickey from his care for an extended period of time is likely to hasten Mr. Hickey's death.  The

21  government offers no information to the contrary.

22        No one can specify in certain and absolute terms what the human body will or will not respond

23  to – that is the very nature of medicine.  But to a 78 year old man with numerous conditions that

24  threaten his life and well-being, the thought of being separated from his longstanding doctor and

25  medical team are far more frightening than any other possible downside of extended incarceration.

26  This factor should be strongly considered by the Court as a §3553(a) argument in support of a

1   mitigated sentence for Mr. Hickey.  To the extent that the Court has further questions for Mr.

2   Hickey's doctors or needs more information about availability of treatment at the Bureau of Prisons,

3   Mr. Hickey respectfully requests an evidentiary hearing to more specifically address the Court's

4   questions.

5       **F.    Mr. Hickey is Not a Danger to Children**

6           Over the course of this case, Mr. Hickey was evaluated by clinical and forensic psychologist

7   Dr. Jules Burstein.  *See* Burstein Report, attached to the Supplemental Falk Declaration, filed under

8   seal, at Exhibit AA.  After conducting an extensive social and background history and administering

9   standard psychological tests such as the Mulitaxial Inventor III, Dr. Burstein concludes that "the

10  clinical and research evidence is compelling that he poses no such danger to children." *Id*. at 10.  Dr.

11  Burstein also found that Mr. Hickey scored lowest on the aspects of the tests that are designed to

12  diagnose pedophilia. *Id*.  To protect Mr. Hickey's privacy, undersigned counsel will withhold her

13  arguments related to Dr. Burstein's report until sentencing.  In the meantime, Mr. Hickey respectfully

14  requests the Court to consider this report as a relevant sentencing factor.  *See, e.g., United States v.*

15  *Baird*, 2008 U.S. Dist. LEXIS 2338 (D. Neb. Jan. 11, 2008)(finding relevant psychologists reports

16  that a defendant "is at a low risk to reoffend and does not meet the criteria for pedophilia" under 18

17  U.S.C. § 3553(a)(2)).

18          Without medical or scientific support, the government objects to the Court's consideration of

19  the Burstein report.  These objections are unfounded, as counsel will address in more detail at the

20  sentencing hearing.  In particular, the government's objection that Dr. Burstein's report relies on Mr.

21  Hickey's self-reported information, without talking to "the prosecutor or the FBI agent on the case"

22  is baffling.  *See* Gov. Mem. at 6:15-16.  What psychological insight could Dr. Burstein possibly

23  glean about Mr. Hickey from talking to the U.S. Attorney's office?  Moreover, it is important to note

24  that the government purports to raise an objection to the administered tests "scientific reliability"

25  with *no* countervailing data. *Id*. at 6:18-19.  The government never sought to have Mr. Hickey

26  evaluated by its own expert, despite having been in possession of the Burstein report for over two

1    months.  Any serious objection to the scientific validity of Dr. Burstein's conclusions should have

2    been addressed long ago – not at sentencing with generic objections that have no scientific or

3    empirical foundation themselves.[3]

4         **G.     Mr. Hickey is Not an Abusive Husband, Father, or Son-in-Law**

5         One remaining issue must be addressed before this Court regarding Mr. Hickey's marital

6    relationship, his previous living arrangement, and the nature of his relationship with his in-laws.

7    Although undersigned counsel was not present for the initial stages of Mr. Hickey's case, it is

8    undersigned counsel's understanding that a bail review hearing was conducted before this Court back

9    in October, 2007.  At that hearing, it is undersigned counsel's understanding that arguments were

10   made by the U.S. Attorney's Office that 1) Mr. Hickey was possibly abusing his son Harlan, 2) that

11   his in-laws were indebted to him and therefore, were afraid of him.  Throughout the sentencing

12   process, questions have also been raised by the U.S. Attorney's Office about the meaning of the age

13   disparity between Mrs. Hickey and Mr. Hickey and whether that disparity reflects badly on Mr.

14   Hickey in a way that is meaningful to the instant offense.  It is important to Mr. Hickey that the air is

15   cleared on the aforementioned issues prior to sentencing.

16        Mr. Hickey has never physically or sexually abused any child, much less his son Harlan.  Much

17   has been suggested about the sleeping arrangement that the Hickeys maintained at the time Mr.

18   Hickey was arrested, which was largely arrived at due to economic realities the family faced, as well

19   as the health of Mr. Hickey's father-in-law.  *See* Falk Declaration, Exhibit D, Letter of Calista Ho at

20   1 ("Dan allowed my husband to stay in one of the bedrooms in his house...we had nowhere to go

21

22

23        [3] The government also accuses Mr. Hickey with lying to Dr. Burstein.  *Id.* at 6:3-6.
     Undersigned counsel has now clarified with Dr. Burstein that the question posed to Mr. Hickey at the
24   interviews was "have you ever been arrested and convicted of any other crime."  As Mr. Hickey was
     placed on pretrial diversion for the 1986 incident and was not convicted of anything, his answer was
25   to Dr. Burstein was accurate.  The language in Dr. Burstein's report is thus a product of an mistake in
     interpretation by Dr. Burstein, rather than evidence of lying on the part of Mr. Hickey.  Dr. Burstein
26   intends to submit a declaration to the Court under seal prior to sentencing to address this issue, as
     well as other issues raised by the prosecution in response to his report.

1   until last year"). Mr. Ho suffered from numerous health problems, so he and Mrs. Ho got the main

2   bedroom in the apartment with the easily accessible bed. Rather than displace their son to the couch,

3   Mrs. Hickey offered to take it. It would have been equally "odd" for Mrs. Hickey to share a bunk

4   bedroom with her son; as such, the living arrangement reflected in the Presentence Report was

5   agreed to by the family. Although everyone agreed that the situation was not ideal in many ways, it

6   hurt the Hickey and Ho families very much that the October court proceedings on the bail issue

7   denigrated the necessary living arrangement as indicative of sexual abusive of Harlan. *Id.* ("How

8   many son-in-laws would be so kind, and yet in court, he and Estella were mocked for it.")[4]   There is

9   no credible evidence before the Court that Mr. Hickey has ever laid a hand on Harlan, or any child.

10  Nor is there any evidence that Mrs. Ho's letter of support is somehow driven by "fear" of Mr.

11  Hickey; in contrast, her letter contains numerous kind and supportive comments, clearly written in

12  her own handwriting. Any assertions or allusions made at sentencing to the contrary should be

13  rejected by this Court.

14       Finally, it is true that Mr. Hickey is significantly older than his wife. Although this age

15  disparity has been alluded to as an indication of some type of deviance on Mr. Hickey's part, there is

16  no evidence that anything untoward or unethical exists at the core of the Hickey marriage. Mrs.

17  Hickey herself has submitted a thirteen page letter to the Court in support of her husband, and asks

18  the Court to spare him a prison sentence. She is adamant that "I am not submissive, or subservient. I

19  am not a mail order bride." *See* Estella Hickey letter, attached hereto as Exhibit H. After marrying

20  Mr. Hickey, Mrs. Hickey graduated from Cebu Central College in the Philippines and worked as a

21  field representative for Proctor and Gamble. She speaks three different languages (Tagalog, Visayan

22  and English) and has worked in the Facilities and Security Department of PriceWaterhouse Coopers

23  for the last twenty-two years. She is an intelligent individual capable of making her own free

24

25       [4]  Nor do the Hos live in fear of Mr. Hickey or act as if they are "indebted" to him. Mrs.
26  Ho's letter indicates strong support for Mr. Hickey. The letter is in her handwriting and makes
    numerous kind comments about Mr. Hickey's care of her husband driving him to medical
    appointments, as well as him willingness to help the couple in the past with assimilation to the
    United States.

DEFENDANT'S SENTENCING MEMORANDUM
*UNITED STATES v. HICKEY,* 07-0634 MMC          **- 14 -**

1     choices, and she has chosen to forgive her husband for the crime he has committed and remain

2     steadfastly loyal to him.  For pages and pages, she explains to the Court all of the attributes that she

3     believes her husband has, and asks the Court to consider these positive qualities at the same time the

4     Court considers the charged conduct.  These statements are in her own handwriting, and at

5     sentencing, Mrs. Hickey will stand by her husband in support and attest that all the things she wrote

6     in her letter are true.  While the age difference may be somewhat unusual between Mrs. and Mr.

7     Hickey, it would be unfair to doubt the veracity of the love and respect between them simply on this

8     basis, and nothing more.

9

10                                       **ARGUMENT**

11 **I.**     **The Guideline Range of 78-97 Months is Only the Starting Point for this Court**

12        **A.**     ***Gall* and *Kimbrough* Clarified the Vast Discretion of this Court to Impose Sentence**

13
14      On December 10, 2007, the United States Supreme Court decided *United States v. Gall*, 128 S.

    Ct. 586 (2007), and *United States v. Kimbrough*, 128 S. Ct. 528 (2007).  In *Gall*, an ecstasy

15     distribution case in which the defendant was in college at the time of the offense, the district court

16     departed from the applicable Guideline range of 30-37 months and sentenced the defendant to 36

17     months of probation.  The Eighth Circuit reversed the district court's sentence.  In its opinion

18     affirming the district court and reversing the Eighth Circuit, the Supreme Court set forth the proper

19     analysis that district courts should follow in evaluating a proper sentence in the wake of *United*

20     *States v. Booker*, 543 U.S. 220 (2005):

21           A district court should begin all sentencing proceedings by correctly calculating

22      the applicable Guideline range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.  The

23      Guidelines are not the only consideration, however.  Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district

24      judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In doing so, he may not presume that the Guideline

25      range is reasonable.  He must make an individualized assessment based on all the facts presented.  If he decides that an outside-Guidelines sentence is warranted, he must

26      consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.

DEFENDANT'S SENTENCING MEMORANDUM
*UNITED STATES v. HICKEY*,  07-0634 MMC      **– 15 –**

1    *Gall*, 2007 U.S. LEXIS 13083 at 20-21 (citations omitted).  "It has been uniform and consistent

2    in the federal judicial tradition for the sentencing judge to consider every convicted person as an

3    individual and every case as a unique study in the human failings that sometimes mitigate,

4    sometimes magnify, the crime and the punishment to ensue."  *Id.* at 26.  Each sentence, regardless of

5    where the sentence falls in comparison to the applicable Guideline range, is reviewed by the Court of

6    Appeals under an abuse of discretion standard.  *Id.*  After *Gall*, it is clear that federal district courts

7    now enjoy tremendous discretion on a case-by-case basis at sentencing.

8    **B.    The Ninth Circuit Has Declined to Apply A Presumption of Reasonableness to a
         Guideline Sentence**

9    On March 24, 2008, the Ninth Circuit together decided the cases of *United States v. Zavala* and

10   *United States v. Carty*, ___F.3d___, 2008 U.S. App. LEXIS 6084 (9th Cir. 2008)(en banc).  In doing

11   so, the Court held that in the Ninth Circuit, "the district court may not presume that the Guideline

12   range is reasonable. . . nor should the Guidelines factor be given more or less weight than any other."

13   *Id.* at *3(citations omitted.)  "While the Guidelines are to be respectfully considered, they are one

14   factor taken among the § 3553(a) factors that are to be taken into account in arriving at an

15   appropriate sentence."  *Id.* at *13(citing *Kimbrough*, 129 S. Ct. at 570; *Gall*, 129 S. Ct. at 594).  In

16   weighing these factors, the district court's discretion is not constrained by "distance alone."  *Id.* at

17   *14.  "Rather, the extent of the difference is simply *a* relevant consideration."  *Id*.  The appellate

18   court will only review the substantive reasonableness of the district court's decision by considering

19   the "totality of the circumstances," giving "due deference to the district court's decision that the §

20   3553(a) factors, on a whole, justify the extent of the variance."  *Id.* at *17-18 (citing *Gall*, 128 S. Ct.

21   at 597, 602).   Under *Zavala/Carty*, while this Court is bound to consider the applicable Guideline

22   range of 78-97 months, this range is not presumptively the correct sentence for Mr. Hickey.  The

23   Court must consider all the factors under § 3553(a) before pronouncing judgment, and any decisions

24   this Court makes will be granted "due deference" should appellate review ensue.

25   \\

26   \\

DEFENDANT'S SENTENCING MEMORANDUM
*UNITED STATES v. HICKEY*,  07-0634 MMC          **- 16 -**

1  **II.   As the Child Pornography Guidelines under U.S.S.G. § 2G2.2 Were Not Formulated**
2  **Through Empirical Data and National Experience, this Court Should Afford the**
   **Guideline Range in This Particular Case Less Weight than Empirically Formulated**
3  **Guidelines.**

4  **A.   In *United States v. Baird*, a Federal District Court Aptly Applied *Kimbrough* to the**
        **Child Pornography Guidelines.**

5    In addition to promoting the district court's discretion under *Gall*, the *Kimbrough* decision

6  cemented an additional important principle applicable to this Court's determination of sentence.  In

7  *Kimbrough*, the Supreme Court upheld a significant departure from the crack cocaine guidelines on

8  the basis that the Guidelines were irrationally harsh and disproportionate as compared to the powder

9  cocaine Guidelines.  In doing so, the Court describes the Sentencing Commission as an agency that

10  usually "fills an important institutional role: it has the capacity courts lack to 'base its determinations

11  on empirical data and national experience, guided by a professional staff with appropriate expertise."

12  *Kimbrough*, ___ 128 S. Ct. at *43-44 (citing *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir.

13  2007).  However, as the *Kimbrough* court also recognized, certain Guidelines promulgated by the

14  Commission "do not exemplify the Commission's exercise of its characteristically institutional role"

15  and thus, should be accorded significantly less deferential weight.   Id. at *45.

16    District courts, as well as legal scholars around the country are now expressing post-

17  *Kimbrough* challenges to the child pornography guidelines under the same rational expressed by the

18  Supreme Court in *Kimbrough* about the crack cocaine Guidelines.  These decisions and law review

19  articles suggest that the Guideline ranges articulated in U.S.S.G. § 2G2.2 should be critically

20  evaluated by a sentencing court due to their "non-empirical" nature.  *See, e.g., United States v. Baird*,

21  2008 U.S. Dist. LEXIS 2338 (D. Neb. Jan. 11, 2008).  In *Baird*, the district court granted a defendant

22  in a child pornography case a significant departure from the applicable Guideline range.  The Court

23  first considered the applicable Guideline range of 46-57 months and accorded respect to the

24  Commission's stated purpose of "advancing sentencing reform goals of reducing sentencing

25  disparity, assuring certainty and severity of punishment, and increasing the rationality and

26  transparence of punishment."  *Id.* at *15-16 (citing United States Sentencing Commission, Fifteen

1    Years of Guideline Sentencing at 11-12 (Nov. 2004.))  In rejecting that Guideline range, the *Baird*

2    court subsequently noted that while the offense levels for many crimes were developed by the

3    Commission through the use of "sentencing statistics" and "data on past practices and recidivism,"

4    the child pornography guideline were not.  *Id.* at *16 (citing Fifteen Year Assessment at 14):

> For policy reasons and because statutory mandatory minimums dictated many
> terms of the Guidelines, the Commission departed from past practices in setting offense
> levels for such crimes as fraud, drug trafficking, and child crimes and sexual offenses.
> Consequently, the Guideline ranges of imprisonment for these crimes are a less reliable
> appraisal of a fair sentence.  The court notes that the Guidelines for child exploitation
> offenses, like the drug trafficking Guidelines, were not developed under the empirical
> approach, but were promulgated, for the most part, in response to statutory directives.
> The Commission itself acknowledges that '[t]he frequent mandatory minimum legislation
> and specific directives to the Commission to amend the Guidelines make it difficult to
> gauge the effectiveness of any particular policy change, or to disentangle the influences of
> the Commission from those of Congress.'  Because the Guidelines do not reflect the
> Commission's unique institutional strengths, the court affords them less deference than it
> would to empirically-grounded guidelines.

12   *Id.* at *16-17 (citations omitted).

13   **B.    Because the 2003 Guideline Enhancements to Possession of Child Pornography
         Guidelines Drastically Increased Sentences Without Corresponding Empirical
14       Data and National Experience, this Court Should Follow *Baird*'s Lead**

15       This Court should follow the *Baird* court's lead in according the child pornography guidelines

16   significantly less deference and weight than empirically grounded guidelines.  The Protect Act, Pub.

17   L. No. 108-21 (2003) forced changes upon the Sentencing Commission in connection with child

18   pornography guidelines without study or evaluation.  The purpose of the Protect Act was to reconcile

19   various bills, establish a nationwide Amber Alert system to be used in cases of child kidnaping, and

20   to address virtual child pornography.  *See* Skye Phillips, *Protect Downward Departures: Congress*

21   *and the Executive's Intrusion Into Judicial Independence*, 12 J.L. & Pol'y 947, 976-984 (2004)

22   (hereinafter "Phillips").  As the legislation progressed, Freshman Congressman Tom Feeney

23   proposed an unrelated amendment to the bill that would directly amend various guidelines.  *Id.; see*

24   *also United States v. Detwiler*, 338 F.Supp.2d 1166, 1170-71 (D. Or. 2004).   Representative  Feeney

25   later admitted he was just the "messenger" for two Justice Department officials who authored the

26   provision and chose not to notify or consult the Sentencing Commission.  *Phillips* at 983 n. 185; 986.

1   Debate on the amendment was limited to twenty minutes. *Id*. at 983. The House later passed the

2   Child Abduction Prevention Act with the Feeney Amendment added. *Id*. at 992-994. Despite

3   objections by the Sentencing Commission, the Chairman of the House Committee on the Judiciary,

4   the Judicial Conference of the United States, and the American Bar Association that these changes

5   were being made without adequate review and analysis, the Protect Act became law in 2003. *Id*. at

6   990-992; 991, n.219.

7        Contained in both the original Feeney Amendment and the final version of the Protect Act was

8   a direct amendment to U.S.S.G. § 2G2.2, adding up to a five-level increase depending on the number

9   of images possessed. *See Protect Act*, § 401(i)(1)(B),(C). These changes, made without adequate

10  study and review by the Commission have a profound affect on this case. Under the 2002

11  Guidelines, Mr. Hickey would have faced a Guideline range of 27-33 months. Now that the

12  effects of the Protect Act have taken shape (the across-the-board increase in the base offense

13  level for straight possession of child pornography designed to make sure the Guidelines are

14  proportionate to the receipt/distribution mandatory minimum of 60 months, as well as the

15  Guideline increases for number and type of pictures), Defendant faces 78-97 months.

16  Enhancements designed to ensure a Guideline commensurate with the inconclusive,

17  unscientific findings of the Protect Act thus add 51-64 months onto the 2002 sentence for the

18  same offense.

19       The Guidelines are usually only considered a cornerstone of reasonableness because it

20  is assumed that each section was "the product of years of careful study." *U.S. v. Claiborne*,

21  439 F.3d 479, 481 (8th Cir. 2006). Where, as here, it is proven that the Guidelines were

22  1) dramatically skewed upwards by the efforts of two DOJ attorneys, who used a novice

23  Congressman to backdoor changes into a major bill, and 2) revised over the objection of the

24  Sentencing Commission, which specifically stated that no careful study or review had been

25  allowed, any presumption that the child pornography Guidelines are reasonable is especially

26  unfounded. The Guidelines articulated under U.S.S.G. §2G2.2 should accordingly be

1    afforded less significantly less weight by this Court.

2

3    **III.    The Factors Listed in 18 U.S.C. § 3553(a) Support the Imposition of a Home Detention Sentence In this Matter**

4
         In the instant case, Mr. Hickey respectfully requests a sentence of 12 months of home detention
5
     as a condition of five years of probation from this Court.  In support of his request, Mr. Hickey
6
     herein argues that each of the applicable factors under 18 U.S.C. § 3553(a) supports a sentence of
7
     home confinement, rather than one of imprisonment.
8

9    **A.    The First Factor: The Nature and Circumstances of the Offense and the History and Characteristics of Mr. Hickey**

10
         Both the offense conduct and Mr. Hickey's history and characteristics support the imposition of
11
     a mitigated sentence in this matter.  Once again, *United States v. Baird* is instructive.  While the
12
     *Baird* court fully concurred with the government that "possession of child pornography is a serious
13
     offense," it also held that possessors of child pornography should be treated more leniently than
14
     distributors:
15
              Possession of pornography is the least serious of the crimes on the continuum of
16       conduct – from possession to distribution to production to predatory abuse – that exploits
         children.  A possessor of child pornography is considerably less culpable than a producer
17       or distributor of the exploitative materials and is a marginal player in the overal child
         exploitation scheme.
18
     *Baird*, 2008 U.S. Dist. LEXIS 2338 at *13-14.  After locating the defendant at the low end of the
19
     exploitation spectrum, the *Baird* court next turned to the history and characteristics of the defendant.
20
     Almost uncannily, defendant Baird's mitigating circumstances mirror those of Mr. Hickey, such as
21
     the following:
22
         ●    Lack of criminal record
23
         ●    Intelligent and well educated
24
         ●    Armed Forces representative who served in actual battle and received several
25            commendations
26
         ●    Compliance with all conditions of pretrial release

- Participation in counseling
- Examined by mental health professionals, who determined that the defendant was not a pedophile or a sexual predatory, with a low likelihood of recidivism
- Suffered significant consequences as a result of arrest, including a felony conviction, sex offender registration, loss of distinguished career
- Demonstrated remorse

*Id.* at *14-15, 20.  As explained above in Defendant's Statement of Facts, Mr. Hickey presents the same positive history and characteristics as defendant Baird for this Court to consider.  In addition to the aforementioned mitigation factors, Mr. Hickey also has also presented many letters to the Court that demonstrate his positive contributions to the public school system for numerous years. Moreover, Mr. Hickey has shown that he is deeply remorseful through the letters of Dr. Daroff, his children and close relatives, as well as the Burstein report.  Deep remorse is an appropriate factor for the Court to consider under 18 U.S.C. § 3553(a)(1).  *See* Burstein Report, Falk Supplemental Declaration at Exhibit AA, filed under seal,  at 6 (indicating that Mr. Hickey takes full responsibility for his conduct); *see also* Daroff Letter, Falk Declaration at Exhibit B; *see also United States v. Pauley*, 511 F.3d 468, 474 (4th Cir. 2007)(36 month departure in child pornography case appropriate due to the Court's careful consideration of 3553(a) factors – including deep remorse.)  Here, Mr. Hickey has also shown that, "beside the criminal conduct at issue, he [i]s a good father and teacher." – another appropriate factor to weigh under 3553(a).  *Id.*  In addition to the loss of his teaching job, Mr. Hickey has also been informed by Morman church superiors that upon conviction, he will be permanently and formally excommunicated from the Morman church, of which he has been a significant part of his life for many years.

As previously argued, the most important and substantial factor for this Court to consider is Mr. Hickey's age and rapidly deteriorating health.  Although this Court is no longer limited to considerations of factors that the Guidelines once found acceptable for departures, it is important to note that under U.S.S.G. § 5H1.1 and §5H1.4, departures were allowed under the old regime for both

1   age and serious infirmity.  *See* U.S.S.G. § 5H1.1 and §5H1.4.  Back in 1993, the Ninth Circuit

2   articulated the procedure for a district court's review of a defendant's age and medical condition

3   under the old mandatory Guideline regime.  *See United States v. Martinez-Guerrero*, 987 F.2d 618,

4   620 (9th Cir. 1993).  When the Guidelines were mandatory, this Court was directed to "first make a

5   factual finding whether [the defendant's] physical and mental disabilities constitute an

6   "extraordinary physical impairment."  *Id.* (citing *United States v. Carey*, 895 F.32d 318, 324 (7th Cir.

7   1990).  The district court was then free to consider "any number of circumstances in making its

8   finding on the question of extraordinary physical impairment under section 5H1.4").  *Id.* (citing

9   affirmatively *United States v. Long*, 977 F.2d 1264 (8th Cir 1992)(district court was free to consider

10  uncontroverted evidence submitted by defendant from his treating physicians that he was vulnerable

11  to victimization and injury in prison, thereby justifying departure from the Guidelines.)  "The ability

12  of the Bureau of Prisons to accommodate a disability is a factor which the district court may consider

13  in making this factual finding. . . but it is not the only factor."  *Id.* (citations omitted).

14      Under § 3553(a), this Court has even more freedom to consider Mr. Hickey's age and medical

15  infirmity than under the old Guideline regime, although the standard has not yet been determined.  It

16  appears from undersigned counsel's review of caselaw that the Ninth Circuit has yet to consider a

17  case post-*Gall/Kimbrough* that reviews a non-Guideline sentence imposed for a defendant under §

18  3553 (a) on the basis of age and infirmity.  At least one district court in the 8th Circuit, however, has

19  substantially addressed this issue.  *See United States v. Coughlin*, 2008 U.S. Dist LEXIS 11263 (W.

20  D. Ark)(February 1, 2008).  Mr. Hickey therefore asks this Court to consider the premises articulated

21  in a fellow district court when balancing his health concerns against the other § 3553(a) factors.

22      Defendant Coughlin, the former executive vice president of Walmart Stores, who was

23  convicted of numerous fraud charges.  *Id.* at * 1.  Pre-*Gall/Kimbrough*, the district court departed

24  downward from 27-33 months to a sentence of home confinement, largely based on Coughlin's

25  medical conditions.  *Id.* at *2.  The Eighth Circuit reversed and remanded, also pre-*Gall/Kimbrough*.

26  *See United States v. Coughlin*, 500 F.3d 813 (8th Cir. 2007).  On remand, the district court again

1   imposed the same sentence under 18 U.S.C. § 3553(a), partially in light of the court's interpretation

2   of the Supreme Court's decision in *Gall/Kimbrough* that it so had that authority. *See Coughlin*, 2008

3   U.S. Dist LEXIS 11263 at *3. Once again, the district court's decision was largely based on

4   defendant Coughlin's various medical conditions. *Id*. at *19 (citing *United States v. Wadena*, 470

5   F.3d 735, 737 (8th Cir. 2006)(district court did not err in reducing sentence under 18 U.S.C. §

6   3553(a) from 18-24 months to probation for a 67 year old defendant with several chronic health

7   conditions including hypertension, hearing loss, cataracts, Type II Diabetes and kidney disease

8   requiring dialysis.) In so ruling, the district court found that "imprisonment might cause Coughlin's

9   death," that his medical condition was "progressive and likely to deteriorate," and that

10  "imprisonment would put Coughling at 'grave' risk of a cardiac event." *Id*. at *20. By departing

11  downward to home confinement so Coughlin could maintain his regular pattern of care with the

12  doctors who best understood Coughlin's condition, the Court found that "even a society resolutely

13  opposed to Coughlin's crimes, if aware of the fragility of Coughlin's condition, the severity of home

14  detention and the potential, tragic result of imprisonment, would deride a legal system that imposed a

15  sentence that threatened the life of the defendant unnecessarily." *Id.* at *21-22. In reimposing the

16  same sentence of home confinement, the district court also observed:

17          The Court is more concerned with engendering derision for the law in those aware
18      of Coughlin's medical condition that might well be outraged by a criminal justice system
        that, despite the great investments of intelligence and moral judgment that contribute to
        that system, produces a sentence that is plainly inhumane. Imprisonment is necessary
19      because probation can accomplish the goals of punishment, while avoiding a serious
        threat to Coughlin's life.

20

21  *Id.* at *22-23. Where, as is the case with Mr. Hickey, "there is little concern for future criminal

22  activity on the part of the defendant and the defendant is in need of medical attention," home

23  confinement is the most appropriate sentence. *Id.* at *26. Here, as in *Coughlin*, the Probation

24  Department is in the best position to administer any forms of treatment, including sex offender

25  treatment, that will ensure that Mr. Hickey does not reoffend. A sentence of home confinement will

26  ensure that Mr. Hickey is "able to receive any medical treatment available without the parameter of

the Bureau of Prisons' limited resources." *Id.* at *27.[5]

For the same rationale articulated by the district court in *Coughlin*, Mr. Hickey respectfully requests this Court to strongly consider the significant medical conditions he suffers from as a basis for the reduced sentence he seeks, pursuant to 18 U.S.C. § 3553(a). It is true that the departure Mr. Hickey seeks is larger than the defendants in either *Coughlin* or *Wadena*. However, under *Kimbrough*, this Court should also consider that pre Protect Act, Mr. Hickey's range would have been comparable to these defendants. The Guideline range has been drastically raised for this offense without the benefit of careful empirical study or Sentencing Commission consideration. Under these circumstances, departure to home confinement is the most humane sentence, "no greater than necessary" to fulfill the goals of sentencing:

> In some cases, the sentence suggested by the Guidelines is not appropriate, as one size cannot be said to fit all. No chart of numbers will ever fully contemplate, quantify, and cipher the endless variations of the human experience. While it might provide a normalizing force in sentencing, we cannot, with a system of points and categories, reduce justice to a numerical formula.

*Id.* at *31.

**B.    The Second and Third Factor: The Need for the Sentence Imposed and the Types of Sentences Available.**

The second factor under 18 U.S.C. § 3553(a) requires the Court to consider the need for the sentence imposed a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; b) to afford adequate deterrence; c) to protect the public from further crimes; and d) to provide the defendant with needed educational or vocational training, medical care,

---

[5] The Court in *Coughlin* conducted a sentencing hearing to determine the extent of the defendant's medical issues. However, in that case, the government's sentencing memorandum offered a declaration contrary to those offered by the defendant. Here, Mr. Hickey has made a prima facie showing of the seriousness of his medical condition, and the government has produced no evidence to the contrary (and has offered no witnesses who suggest that Mr. Hickey's numerous medical conditions could be adequately treated by the Bureau of Prisons.) Dr. Shlipak is unavailable to testify at the April 23, 2008 sentencing as Wednesdays are the one day per week that he treats patients at the VA Medical Clinic. To the extent the Court needs additional information about Mr. Hickey's conditions, Mr. Hickey respectfully requests this Court to hold further proceedings rather than proceeding directly to sentencing on April 23, 2008.

1  or other correctional treatment in the most effective manner.  *See* 18 U.S.C. § 3553(a)(2).  In

2  conjunction with this factor, the Court should consider the third factor under 3553(a), which is "the

3  kinds of sentences available."  18 U.S.C. § 3553(a)(3).  Here, the kinds of sentences that are

4  technically available to the Court include probation, probation with a period of home or community

5  confinement, and a custodial sentence.  As recognized by the *Gall* court, a probationary sentence is

6  "not granted out of a spirit of leniency" and "is not merely letting an offender off:"

7           Custodial sentences are qualitatively more severe that probationary sentences of
         equivalent terms.  Offenders on probation are nonetheless subject to several standard
8        conditions that substantially reduce their liberty.  Probationers may not leave the judicial
         district, move, or change jobs without notifying, and in some cases receiving permission
9        from, their probation officer or the Court.  They must report regularly to their probation
         officer, permit unannounced visits to their homes, refrain from associated with any
10       person convicted of a felony, and refrain from excessive drinking.  Most probationers are
         also subject to individual "special conditions" imposed by the Court.

11
   *Gall, supra*, at 18 (citations omitted).  In many cases, probation coupled with a condition of
12
   home confinement is viewed as an adequate punishment, both to promote respect for the law, reflect
13
   the seriousness of the offense, and afford adequate deterrence.  Such is the case with Mr. Hickey.
14
   There is no indication from Mr. Hickey's background that he poses a risk as a violent offender, a
15
   danger to children, or an individual that the public must be protected from through incarceration.
16
   Numerous individuals have attested to his strong sense of remorse and shame about his actions.
17
        A sentence of six and a half years is not the appropriate sentence for Mr. Hickey.  In so
18
   arguing, it should be noted that Mr. Hickey fully concurs with government counsel that
19
   possession of child pornography is an extremely serious offense, and that the images in
20
   particular that he possessed are horrendous images. He in no way quarrels with the
21
   government's arguments that viewers of child pornography fuel an industry that must be
22
   stopped to prevent harm to children, and that individuals who view child pornography are an
23
   essential part of the chain.  He also agrees completely that his actions were totally wrong,
24
   legally and morally.  Not a day goes by that Mr. Hickey fails to think about this offense with
25
   deep regret and shame, or fails to challenge himself to try to figure out where his moral
26
   compass went awry.  He stands before the Court with a keen understanding of the reasons

1    this Court must consider his crime and his actions with the utmost seriousness and most

2    likely, with an eye toward incarceration.

3        At the same time the Court looks at the indefensible images in this matter and the

4    seriousness of the offense, it is also important to put Mr. Hickey on the spectrum of this

5    horrific industry.  As explained by the *Baird* court, "a possessor of child pornography is

6    considerably less culpable than a producer or a distributor."  *Baird*, 2008 U.S. Dist LEXIS at

7    *13-*14. Here, Mr. Hickey neither ran his own website, nor operated a child pornography

8    server.  He did not join organizations or subscribe to child pornography sites.  Moreover, Mr.

9    Hickey never engaged in distribution of child pornography, or participated in chat rooms or

10   communications that engaged minors.   Despite these factors, Mr. Hickey faces a Guideline range

11   that is substantially above the mandatory minimum for an individual who is guilty of these higher-

12   culpable acts.  The sentence requested by the government does not take this into account.

13       In terms of vocational and educational training, Mr. Hickey does not require (and would not

14   likely benefit from) the types of training and education that are available in the prison system.   On

15   the other hand, he is in dire need of consistent medical care with the doctors who have always treated

16   his conditions.  A probation sentence coupled with home detention would allow Mr. Hickey to be

17   closely monitored by this Court to ensure that he makes forward progress in treatment, as suggested

18   by Dr. Burstein, but will also ensure that he does not suffer an early death through separation with

19   his doctors.   Home detention is, in sum, the sentence "sufficient, but no greater than necessary" to

20   meet the sentencing goals articulated in 18 U.S.C. § 3553(a).[6]

21

22   ───────────────
          [6]The fourth 3553(a) factor, the Guideline range, has been previously discussed in Part II,
     above.  The fifth factor, policy statements issued by the Sentencing Commission, has previously been
23   addressed in Part II, above; namely, Mr. Hickey's argument that the Guideline range associated with
     this offense does not reflect the type of careful empirical analysis and study that typically
24   accompanies the work of the Sentencing Commission.  Instead, as government counsel notes, the
     amendments that have dramatically increased sentences in child pornography cases were driven
25   solely by Congress. See Gov Mem. at 8:20-22.  The sixth factor, the need to avoid unwarranted
     sentencing disparities, is addressed in Mr. Hickey's argument that the sentence requested by the
26   government is one more typically arrived at for distributors of child pornography or enticement
     cases. According to undersigned defense counsel's review,  the seventh factor (the need to provide
     restitution to any victim) are not applicable to Mr. Hickey's case.

**IV.  If a Sentence of Incarceration is Imposed, this Court Should Allow Mr. Hickey to Self-Surrender Directly to a Bureau of Prisons Facility that is Prepared to Handle His Many Medical Conditions.**

Mr. Hickey concedes that, under 18 U.S.C. § 3143(b)(2), possession of child pornography is considered a "crime of violence" that ordinarily mandates detention pending trial and after sentencing.  However, it is equally apparent that, pursuant to 18 U.S.C. § 3145(c), Mr. Hickey's age and medical conditions meet the "exceptional reasons" standard that operates as an exception to the mandatory detention of § 3143.  This Court previously considered the government's arguments to invoke this presumption against Mr. Hickey in October, 2007, and rejected them.  Nothing has changed between October, 2007 and today that alters the "exceptional circumstance" analysis that this Court has previously held applies.

The first part of the § 3145 test is that the Court find by clear and convincing evidence that Mr. Hickey is not a flight risk or a danger to the community.  Since October, 2007, Mr. Hickey has made all court dates, reported without fail to Pretrial Services, and has not violated one condition of his pretrial release.  At 78 years old, he has no job and no base of support outside his family, who live locally.  The government's Sentencing Memorandum does not state any facts that tend to show that Mr. Hickey is any sort of flight risk or danger to the community.  This Court should continue to find that Mr. Hickey meets this part of the release test.

The "exceptional circumstances" that justified Mr. Hickey's release back in October, 2007 and continue to do so today are his age and precipitous medical condition.  The local facility that is "equipped" to handle medical complications for federal pretrial and post-trial detainees is the Santa Rita Jail in Dublin, California – which is a state-run facility responsible for the medical care of hundreds of inmates.[7]  Conditions of confinement are considerably more arduous at Santa Rita than

---

[7] Undersigned counsel has had one client die this year at the medical facility at Santa Rita Jail – due to the fact that the client had a heart attack in the infirmary that allegedly went unattended by the medical staff.  The client was found on the floor in a way that made EMT staff believe that he had been without oxygen for several minutes. By the time EMT personnel arrived at the jail, it was too late to resuscitate the client in a meaningful way.

they would be at a low security Bureau of Prisons facility, to which Mr. Hickey would most certainly be assigned.  While there is no assurance that the Bureau can manage Mr. Hickey's medical care, including his nightly C-PAP machine – it is virtually guaranteed that the Santa Rita jail could not. Remanding Mr. Hickey, a 78 year old man, to the county jail on April 23 – without any advanced input from his treating physicians – and without enabling counsel the opportunity to contact the Bureau of Prisons to try to put together some kind of advance-notice, managed care plan in conjunction with Mr. Hickey's doctors (which self-surrender would at least provide counsel the opportunity to do) would not be in the best interest of Mr. Hickey, justice, or the public at large.

### CONCLUSION

In light of the aforementioned factors, Mr. Hickey respectfully submits that his current situation present unusual and complex circumstances that warrant this Court's strong consideration of the many mitigating factors that exist this case.  He accordingly asks the Court to sentence him to 6 months of home confinement and five years of probation.

DATED: April 21, 2008

Respectfully submitted,

BARRY J. PORTMAN
Federal Public Defender

/S/

_____
ELIZABETH M. FALK
Assistant Federal Public Defender